1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF ILLINOIS
2            EAST ST. LOUIS DIVISION
           CASE NO. 3:15-cv-1253-NJR-DGW
3

4    ───────────────────────────────────────────────

     RYAN RUDDELL                                    PLAINTIFF
5
     v.
6
     MARATHON PETROLEUM CO., LP,
7    MARINE TRANSPORTATION                          DEFENDANT

8    ───────────────────────────────────────────────

9

10

11

12          VIDEOCONFERENCE DEPOSITION OF

13          CAPTAIN MICHAEL WAYNE SCOTT

14

15

16

17                Ashland, Kentucky
                   July 13, 2016
18

19

20

21
                Lisa Larson, FCRR, RPR
22       Federal Certified Realtime Reporter

23

24

**Page 2**

1    Pursuant to Notice, the videoconference
2    deposition of CAPTAIN MICHAEL WAYNE SCOTT was taken
3    on behalf of the Plaintiff before Lisa Larson, FCRR,
4    RPR, and Notary Public in and for the Commonwealth of
5    Kentucky at Large, at Holiday Inn Express & Suites,
6    Meeting Room, 13131 Slone Court, Ashland, Kentucky,
7    on July 13, 2016, commencing the hour of
8    10:02 a.m.
9            The deposition was taken for all purposes
10   permitted under the Federal Rules of Civil Procedure,
11   including use as evidence at the trial of this
12   matter.
13
14
15
16
17
18
19
20
21
22
23
24

**Page 3**

1              A P P E A R A N C E S
2
      COUNSEL FOR THE PLAINTIFF:
3    (By videoconference)
4       Dennis M. O'Bryan, Esq.
        O'Bryan, Baun, Karamanian
5       401 South Old Woodward, Suite 463
        Birmingham, Michigan 48009
6       dob@obryanlaw.net
7
      COUNSEL FOR THE DEFENDANT:
8
        Raymond L. Massey, Esq.
9       Daniel L. Massey, Esq.
        THE MASSEY LAW FIRM, LLC
10      Two CityPlace Drive, Suite 200
        Saint Louis, Missouri 63141
11      ray@themasseylawfirm.com
12
      ALSO PRESENT:
13
        Tara M. Griffith, Esq.
14      Marathon Petroleum Company, LP
15      Adrian J. Pringle, Human Resources Consultant
        Marathon Petroleum Company, LP
16
17
18
19
20
21
22
23
24

**Page 4**

1                      INDEX
2
3    WITNESS:  CAPTAIN MICHAEL WAYNE SCOTT
4    EXAMINATION BY:                          Page
5       Mr. O'Bryan                             5
        Mr. Raymond Massey                     47
6       Mr. O'Bryan                            66
7    REPORTER'S CERTIFICATE                    76
     ERRATA SHEET                              77
8
9
                      EXHIBITS
10
11
        NO.           DESCRIPTION
12
        Exhibit 1     Various documentation       75
13                    related to incident and
                      referenced herein
14
15   (The original exhibit was attached to the original
        transcript and a copy was provided to counsel)
16
17
18
19
20
21
22
23
24

**Page 5**

1              CAPTAIN MICHAEL WAYNE SCOTT,
2    the witness herein, having first been duly placed
3    under oath, was examined and testified as follows:
4                      EXAMINATION
5    BY MR. O'BRYAN:
6    Q   Okay.  Sir, could you please state your name.
7    A   Michael Wayne Scott.
8    Q   And you're employed by Marathon?
9    A   Yes, sir.
10   Q   For how long?
11   A   Eight years.
12   Q   And you're a captain?
13   A   Yes, sir.
14   Q   And you were the captain of the boat on
15       August 27th of 2014 when Ryan Ruddell was --
16       claimed an injury?
17   A   Yes, sir.
18   Q   What is the rule at Marathon with regard to
19       working in thunderstorm conditions?
20   A   If there's any lightening we do not work.  We shut
21       the -- shut everything down.
22   Q   Why is that?
23   A   Because we don't want our employees to get injured
24       or hurt.

Page 6

1  Q  Was the loading facility shut down at any time on
2     August 27th of 2014?
3  A  That, I don't know who -- if anybody was on the
4     dock loading up there or not.
5  Q  There has been some testimony that the loading
6     facility was shut down because of lightening.
7     Do you know anything about that?
8  A  No, sir.
9  Q  Okay.  So what were the -- you knew that there was
10    bad weather coming on when the ship started that
11    Mr. Ruddell was on, isn't that correct?
12 A  Yes, sir.  I knew there was rain coming.
13 Q  Can you please repeat that.
14 A  Yes.  I knew there was rain coming, yes.
15 Q  Okay.  Did you know that there were -- where did
16    you learn that from?
17 A  By observing behind me and by my radar.
18 Q  And don't you get anything over the radio that you
19    listen to with regard to that?
20 A  You can listen to the Weather Channel, but the
21    Weather Channel wasn't on.  And, plus, I use apps
22    on my phone.  I can see what the weather is doing.
23 Q  And, okay, so what time was it about that
24    Mr. Ruddell was -- this injury was noted to have

Page 7

1     taken place?
2                 MR. RAYMOND MASSEY:  Object to the
3         form of the question.  If you want to see
4         incident reports or anything, you are welcome
5         to do that.  He didn't ask you about that,
6         but you can if you need that.
7                 MR. O'BRYAN:  Yeah.  Feel free.
8  Q  Have you reviewed any documents to refresh your
9     recollection?
10 A  Yes, sir.
11 Q  No, you have not?
12 A  Yes, sir, I have.
13 Q  Oh, okay.  Okay.  What have you looked at?
14 A  I don't understand what -- what the question --
15    what are you wanting to know?  When he reported
16    the incident to me?
17 Q  No.  I moved on to another question.  I asked what
18    documents you have reviewed.  I'll ask counsel.
19                 MR. O'BRYAN:  Has he reviewed any
20        documents that we have not already noted to
21        be potential exhibits?
22                 MR. RAYMOND MASSEY:  No.  He's
23        looked at some, at least, of the ones you
24        have mentioned, Dennis.  And do you want me

Page 8

1     to give him the incident report to look at
2     or?
3                 MR. O'BRYAN:  Yeah, that would be
4         fine.
5                 MR. RAYMOND MASSEY:  Okay.  I'm
6         giving him -- Captain, I'm giving you the
7         003, also 006, also 0643, which is a log, and
8         0711, which is an employee statement, and
9         also 339, 340, and 719 and 722.
10                All of these, you know, you
11        mention, Dennis, as ones you might be
12        interested in.  So I've given all of these to
13        the Captain, okay?
14                 MR. O'BRYAN:  Okay.
15 BY MR. O'BRYAN:
16 Q  Have you reviewed any documents other than those
17    ones that were just handed to you by defense
18    counsel?
19 A  There was a few others that I have seen other than
20    these but not very many.
21 Q  What were they?
22                 MR. O'BRYAN:  Counsel, can you tell
23        me?
24                 MR. RAYMOND MASSEY:  If you

Page 9

1     remember, Captain.  I mean, if you don't
2     remember, that's fine.
3  A  I've seen ones where Isaac Perkins took a
4     deposition on Dane Haukedahl and Blake Ginn.
5  Q  Okay.
6                 MR. O'BRYAN:  Ray, has he looked at
7         anything that we have not marked as exhibits.
8                 MR. RAYMOND MASSEY:  I don't think
9         so, Dennis.  I mean, nothing comes --
10 Q  Okay.  You haven't given any other statements to
11    anybody that -- outside of these?
12                 MR. RAYMOND MASSEY:  Yeah, I mean,
13        he may have looked at the other statements --
14        or not statements, but whatever they are, of
15        the other witnesses that you are going to
16        talk to today.
17                 MR. O'BRYAN:  Right.
18 Q  But you haven't given any other statements, other
19    than --
20                 MR. RAYMOND MASSEY:  No, no.  No,
21        there are no other statements to my
22        knowledge.
23                 MR. O'BRYAN:  Okay.
24 BY MR. O'BRYAN:

Page 10

1  Q  So what was your understanding that the weather
2     was going to be?
3  A  That it was going to rain.
4  Q  Well, it was going to get bad; isn't that a better
5     description of it?
6  A  I can't determine if it's going to be bad that far
7     away or not.  I mean, I just knew the rain was
8     coming.
9  Q  Well, let's look at Exhibit 339.  Tell me when you
10    have got that in front of you.
11            MR. RAYMOND MASSEY:  Okay.  You
12        might ask him if he knows what that is.
13        Because, I mean, that's -- I think you'll
14        find that's not the Captain's writing.  I
15        think it is somebody else's.  But go ahead.
16 BY MR. O'BRYAN:
17 Q  You were interviewed by somebody who was taking
18    notes, correct?
19 A  Yes, sir.
20 Q  And was that Mr. Isaac --
21 A  Perkins?
22 Q  -- Perkins?  Was that -- who that -- was that?
23 A  Isaac Perkins.  He was the HR guy at Marathon.
24 Q  All right.  And he recorded that you said at 5:30

Page 11

1     in the afternoon you were tied off in the fleet
2     and the weather was about to get bad.
3         Do you see that, the first line there, the
4     first couple of lines?
5             (Witness reviews document)
6  A  Yes.
7  Q  Okay.  So does that refresh your recollection?
8  A  Yes, sir.
9  Q  So the weather was about to get bad, correct?
10 A  Yeah.  It was fixing to go from not raining to
11    raining, yes.
12 Q  Well, I mean, you wouldn't consider a sprinkling,
13    it is going to sprinkle bad, would you?
14            MR. RAYMOND MASSEY:  Let me object
15        to the form of the question.  It is
16        argumentative.  Go ahead, Captain.
17 A  No.  A sprinkling would not be as bad as a
18    downpour, no.
19 Q  So you were expecting a downpour?
20 A  It was an afternoon thunderstorm, yeah.  I was
21    expecting it to rain, but I couldn't predict how
22    heavy it was going to be.
23 Q  Okay.  So you knew there was going to be an
24    afternoon thunderstorm?

Page 12

1  A  Yes, sir.
2  Q  Okay.  And thunder means lightening, correct?
3  A  Sometimes.
4             MR. RAYMOND MASSEY:  Object to the
5         form of the question.  Go ahead.
6  Q  Who said "sometimes"?  Was that you or was that
7     Ray?
8  A  That was me.
9  Q  Oh, okay.  All right.  So, now, at this -- at 5:30
10    you were tied off in the fleet, isn't that
11    correct?
12            MR. RAYMOND MASSEY:  I don't think
13        that is correct.
14 A  No, sir, that is not correct.
15 Q  Or it says, "5:30 afternoon tie-off in fleet.
16    Weather was about to get bad."  What does that
17    mean?
18            MR. RAYMOND MASSEY:  Let me object
19        to the form of the question.  Now, I don't
20        think you have established it.  But as I
21        indicated, these are not the Captain's notes.
22        These are notes of somebody else who is not
23        here to be deposed.  But it was Mr. Perkins.
24        So, I mean, he can look at logs and tell you

Page 13

1     what he was doing if you are looking for what
2     he was doing on the vessel.
3             MR. O'BRYAN:  We have already
4         established it was by Mr. Perkins.
5  BY MR. O'BRYAN:
6  Q  "5:30 afternoon tie-off in fleet.  Weather was
7     about to get bad."  Would you agree with that
8     statement?
9  A  No, sir.  I was not tying off at 5:30.
10 Q  What were you doing at 5:30?
11            MR. RAYMOND MASSEY:  Feel free to
12        look at the logs, Captain.
13 A  At 5:30 I was at the wheelhouse, two miles from
14    getting out of the canal, Chain of Rocks Canal.
15    Ryan Ruddell, Dane Haukedahl, and Blake Ginn were
16    in the wheelhouse going over shift starter, which
17    was tying off in the fleet, and doing their
18    stretching exercises.
19 Q  And you were more or less telling them what you
20    guys were about to get into?
21 A  Yes, sir.
22 Q  And you told them that you had a big storm coming,
23    isn't that correct?
24 A  I told them there was a storm coming, yes.

Page 14
1  Q  And you have got to hurry up and get there,
2     wherever you were going, isn't that correct?
3  A  No, sir.  I never did tell them to hurry up.
4  Q  And did you tell them to hurry up and tie you in
5     before the storm comes because it is really bad?
6  A  No, sir.
7  Q  Now, if you have this rule about not working under
8     lightening conditions and you know -- you knew
9     that a thunderstorm was coming, how come you just
10    didn't sit until it passed?
11 A  We have worked in the rain before.  Like I said,
12    just because a thunderstorm, is does not mean
13    there is going to be lightening associated with
14    it.
15 Q  Well, what is thunder in your opinion?
16 A  When there's a big clap of noise in the sky.
17 Q  And there was lightening, though, in this storm,
18    isn't that correct?
19         MR. RAYMOND MASSEY:  Object to the
20    form of the question.  What time are you
21    talking about, Dennis?
22 Q  I'm asking, when this storm hit was there
23    lightening?
24         MR. RAYMOND MASSEY:  But what time

Page 15
1     are you talking about?  Object to the form of
2     the question.
3  Q  I'm asking when this storm hit, was there
4     lightening.
5         MR. RAYMOND MASSEY:  I know.  But
6     I'm objecting to the term "hit."  What are
7     you talking about, "hit"?  I mean, there was
8     a thunderstorm in the Saint Louis area
9     sometime on that day, before midnight, before
10    it went to the next day, that's one thing.
11    But you are not being specific about what
12    time you are talking about.  That's why it is
13    vague and ambiguous.
14         MR. O'BRYAN:  Yeah.  I can
15    understand, you want to telegraph the answer
16    to the witness.
17         MR. RAYMOND MASSEY:  Well, no.  It
18    is just --
19 BY MR. O'BRYAN:
20 Q  But did you observe lightening at any time on
21    August 27th of 2014?
22 A  Yes, sir.  After the crew had returned back to the
23    boat, after we tied off is when the lightening
24    started to appear.

Page 16
1  Q  So you would dispute -- or strike that.
2         So looking at these documents, what time did
3     this incident occur with regard to Mr. Ruddell?
4  A  He has put on there 18:45, the time.
5  Q  What time is that?  6:45?
6  A  Eighteen hundred?  Yeah, that would be 6:45.
7         MR. RAYMOND MASSEY:  Just so you
8     know, Dennis, I think the times, all the
9     times refer to Eastern Standard Time.  And
10    the only reason I mention that is because the
11    Saint Louis area is on a different time zone
12    than the time zone that's on these documents.
13    But you can ask the Captain, but I think all
14    the times you will see are Eastern Standard
15    Time as opposed to what the time was actually
16    in Saint Louis.  Do you understand what I am
17    saying?
18         MR. O'BRYAN:  Right.
19 BY MR. O'BRYAN:
20 Q  So, now, when are you -- when did you say that you
21    observed the lightening?
22 A  After the crew members had returned to the boat,
23    were already back on the boat.
24 Q  Now, how many times have you met with defense

Page 17
1     counsel to discuss this event?
2  A  I just met with him yesterday; it was the first
3     time.
4  Q  Where at?
5  A  At -- at the office, Marathon office, in
6     Catlettsburg.
7  Q  For how long?
8  A  It was about an hour and a half yesterday.
9  Q  Who else was in the room?
10 A  His son and our -- I can't think of her name at
11    the moment.
12 Q  Who besides his son?
13         THE WITNESS:  What is your name,
14    again?
15         MS. GRIFFITH:  Tara Griffith.
16 A  Tara.
17         MR. RAYMOND MASSEY:  In-house
18    lawyer for Marathon.
19         MR. O'BRYAN:  Okay.
20 BY MR. O'BRYAN:
21 Q  So the thunderstorms were going on while you were
22    conducting operations, isn't that correct, with
23    Mr. Ruddell?
24 A  When we got up there, started the landing, that's

Page 18

1    when the rain hit.
2  Q  So where is that in relation to 6:45?
3  A  That would have probably been roughly about 18:30
4     or so.
5  Q  Okay.  So at what time are you saying you observed
6     the lightening?
7  A  That, I couldn't specify what exact time that was.
8     All I can tell you is the crew members were on the
9     boat, back on the boat.
10 Q  Well, when they were conducting operations,
11    though, the thunderstorms had hit, isn't that
12    correct?
13 A  Yes.  It was raining when -- when they were out
14    there conducting operations.
15 Q  Now, how bad was the rain?
16 A  The rain started out light and then it became
17    heavy.
18 Q  And so, then, would you agree that at 6:45 or
19    thereabouts that the thunderstorms had hit by
20    that time?
21             MR. RAYMOND MASSEY:  Object to the
22        use of the term "thunderstorms."  It is vague
23        and ambiguous as to what you are talking
24        about.  And "hit" is vague and ambiguous as

Page 19

1     well.  I object on those grounds.
2             Go ahead, Captain, if you can
3        answer.
4  A  Would you repeat the question again.
5  Q  Would you agree that by 6:45 the thunderstorms had
6     hit?
7             MR. RAYMOND MASSEY:  The same
8        objection.  Go ahead, Captain.
9  A  Yes, sir.  I would say that the storm had hit at
10    that time, yes.
11 Q  Well, I'm saying thunderstorm.
12 A  Yes, sir, thunderstorm.
13 Q  Okay.  And it progressively got worst once it
14    started?
15 A  Yes.  It -- like I said, it started out slowly, a
16    light rain, and then it progressed into a heavy
17    rain.
18 Q  What did the sky look like that you could tell by
19    the appearance of it that there were thunderstorms
20    coming?
21 A  At what time was you wanting to know about this?
22 Q  I thought you indicated earlier that you could
23    tell that there was bad weather coming by looking
24    at the sky.

Page 20

1  A  All right.  When I came on watch, I could look
2     behind me and over the city front of Saint Louis
3     you could see the black clouds.  But where I was
4     at, there was no clouds.
5  Q  And what time did you come on watch?
6  A  I came on watch at 5 o'clock.
7  Q  And the rain was so heavy that you could not see
8     the crew, isn't that correct?
9             MR. RAYMOND MASSEY:  Object to the
10        form of the question, as to what time are you
11        talking about?
12            MR. O'BRYAN:  Let's say 6:45.
13 A  Or that's when you are saying that he hurt
14    himself, at 6:45?
15 Q  Yeah.
16 A  I could not see him from there, even if it wasn't
17    raining.  Due to the configuration of the barge, I
18    cannot see the crew members from the wheelhouse.
19 Q  Right.  But the rain coming down was of such a
20    severity that it impeded your vision, too, isn't
21    that correct?
22 A  Yes, sir.
23 Q  And what about the videos?  What videos were
24    pulled off the boat?

Page 21

1  A  I have no clue if any videos were pulled off.  I
2     have no access to do any of that.
3  Q  Okay.  Well, look at 3:40, the second page of
4     notes by Isaac Perkins.  Do you see the last line
5     that he wrote down there?
6             (Witness reviews document)
7  A  Yes, sir.
8  Q  "Pulled videos at Mike of the boat."  Do you see
9     that?
10 A  Yes, sir.
11 Q  What videos are there on the boat?
12 A  We have cameras stationed all around the boat
13    which are recording all the time.
14 Q  Okay.  And they were -- and what is the purpose of
15    that?
16 A  The purpose of that is I can use them to help
17    navigate when trying to come in to docks.  Like
18    backing in to Garyville, I can see how close I'm
19    getting to the pylons and stuff.
20 Q  I'm talking about, though, recording videos, I
21    mean, to have a video record.
22       What is the purpose of having the video
23    record?
24 A  Marathon uses that to record in case there's ever

Page 22

1      any accidents/incidences with other vessels or
2      anything --
3   Q  Okay.
4   A  -- so we would have them.
5   Q  So there was an accident reported that occurred on
6      that day by Mr. Ruddell, isn't that correct?
7   A  On that day he did not report nothing to me.
8   Q  Well, the next day.
9   A  The following day, yes, it was brought to my
10     attention.
11  Q  Okay.  And the video -- okay.  So that's the type
12     of accident that typically you would retain the
13     video for, correct?
14  A  I have no way of retaining the video.  That's
15     beyond my control.
16  Q  Well, where did they go when they were -- did you
17     know that they had been pulled off at the time?
18  A  Like I said, I couldn't tell you because I don't
19     know.  I'm -- I don't have access to do that, and
20     every so many days that stuff is recorded over.
21         MR. RAYMOND MASSEY:  Just so you
22     know, Dennis, it is kind of confusing, but
23     there are different videos they are talking
24     about there on that line that you just

Page 23

1      referred to.  That's talking about Mike's
2      videos, Mike's, Inc. videos.  Do you
3      understand that or not?
4         MR. O'BRYAN:  No, I don't.
5         MR. RAYMOND MASSEY:  Well, you
6      might ask the Captain, if you want to know;
7      if you don't, that's fine.  You can leave it
8      kind of confused.  But...
9   Q  Well, I mean, what does this "Mike" mean?
10  A  Mike's is a shipyard up there at Wood River, and
11     they have video surveillance on their docks.
12  Q  Well, their videos would be on your boat?
13  A  No, sir.
14  Q  Well, it says, "Pulled videos at Mike's off the
15     boat," correct?
16  A  Yeah.  But they were referring to Mike's shipyard.
17  Q  So "pulled the videos on the boat off the boat at
18     Mike's" correct?
19  A  This is -- you're confusing me.
20         MR. RAYMOND MASSEY:  Do you want me
21     to tell you, Dennis, to speed it along?
22         MR. O'BRYAN:  Sure.
23         MR. RAYMOND MASSEY:  Mike's, Inc.
24     has a facility there, and that's where

Page 24

1      Ruddell got off.  Mike's, Inc. has videos at
2      their facility.  What they talked about is
3      getting Mike's videos that would show Ruddell
4      getting off the boat, that would show if he,
5      you know, if he was limping around or had any
6      injury or whatever.  That is what that is
7      referring to.  It is referring to securing
8      Mike's, Inc.'s video, if they have any, and
9      we know that they customarily have recordings
10     at their facility.  That's what that refers
11     to.
12         MR. O'BRYAN:  Well, the videos on
13     the boat --
14         MR. RAYMOND MASSEY:  They weren't
15     pulled off, to my knowledge.  But go ahead
16     and ask anything you want.  I just wanted to
17     clear up.  I know you were concentrating on
18     that line there.  And that's what that line
19     refers to, is go to Mike's and see if they
20     have got any videos of Ruddell getting off
21     the boat and, if so, pull them.  I think.
22     But ask the Captain.
23  BY MR. O'BRYAN:
24  Q  The videos that are on the boat record events as

Page 25

1      occurring out on the tow, isn't that correct?
2   A  There are two cameras that record out on the tow
3      from the wheelhouse, yes.
4   Q  Okay.  So what I am asking about is the video that
5      recorded the events as they were occurring at or
6      about 6:25 on August 14th of -- or August 27th of
7      2014.  What about those videos?
8   A  Like I said, I have no control over them videos.
9      That's up to the office to -- to pull them videos,
10     if they wanted to pull them.  Other than that, I
11     have no control.  I cannot access them or nothing.
12  Q  Were they pulled?
13  A  Like, again, I -- I do not know, sir.
14  Q  Does someone have to come on the boat to pull them
15     or is it internet or something?
16  A  They could pull them from the office.  They have
17     -- we have satellite.
18  Q  And they could pull them off the boat, too?
19  A  Yes.  They can access the videos from the office
20     that's on the boat.
21  Q  No.  I'm saying, is there like a disc on the boat
22     or a VHS or anything?
23  A  It's more like a -- like on an airplane, you know,
24     they have the, what is it called, the black box or

Page 26

```
 1     whatever.  Ours is called the blue box.
 2     Basically, it's, I guess, a hard drive on there
 3     that stores that stuff.
 4   Q Okay.  And was that box ever removed?
 5   A No, sir.
 6   Q So you don't know anything about these
 7     forward-looking videos that would have been made
 8     on or about August 27th, 2014 at 6:45 p.m.,
 9     correct?
10   A All I can tell you is the cameras were recording.
11     And after -- what happens to the videos after
12     that, I have no idea.
13   Q So when is it you say -- I'm sorry.  I know you
14     have already answered.
15       But when is it you say you first saw the
16     lightening?
17   A After the crew members had returned to the boat.
18   Q And what did you do then?
19   A We were already tied off and everybody was inside.
20   Q Let's look at number 729 for a minute.
21           MR. RAYMOND MASSEY:  Let's see.
22     What is 729, Dennis?
23           MR. O'BRYAN:  It is the official
24     accident report.
```

Page 27

```
 1           MR. DANIEL MASSEY:  It is the same
 2     as six, I believe.
 3           MR. RAYMOND MASSEY:  The same as
 4     six, is that right?
 5           MR. O'BRYAN:  Yeah, probably.
 6           THE WITNESS:  That is his right
 7     there (indicating).
 8           MR. RAYMOND MASSEY:  Okay.  He's
 9     got -- the Captain has 06 in front of him.
10     That may be a duplicate.  But it is titled up
11     at the top "MPC and Contractor Occupational
12     Injury/Illness Incident Report" signed by the
13     Captain.  Is that what you wanted?
14           MR. O'BRYAN:  Yeah.
15           MR. RAYMOND MASSEY:  Okay.  That's
16     in front of him.
17   BY MR. O'BRYAN:
18   Q Before we get to that.  Now, when you came on
19     watch, tell me all of the ways that are available
20     to you to become knowledgeable of upcoming weather
21     besides looking at the sky.
22   A I have a radar which I can adjust to mileage.  I
23     have like four apps on my phone where I can watch
24     the weather.  And if I want to, I can also access
```

Page 28

```
 1     the weather channels on the radio -- VHS radios.
 2   Q And what did you do on that day --
 3   A Observed --
 4   Q -- that you recall?
 5   A For one, I observed behind me.  And, second, I
 6     used one of the apps on my phone which showed the
 7     -- the storm over Saint Louis.
 8   Q And did it say lightening?
 9   A No, sir.
10   Q What did it say about the storm, if you recall?
11   A It was a radar app, is what I looked at.
12   Q So you didn't look at -- did you look at anything
13     that would have indicated lightening?
14   A No, sir.  I didn't look at nothing that would
15     predict if there was lightening.
16   Q I'm saying -- okay.  You looked at the app and
17     your radar and the sky, correct?
18   A Yes.
19   Q And would your app indicate just thunderstorms or
20     would it indicate lightening also?
21   A The app I used was just the radar app showing the
22     thunderstorm.
23   Q Oh.  So you can -- it is more or less a visual
24     thing, you see the dark clouds on an app?
```

Page 29

```
 1   A It's like what you would see on TV when they show
 2     the weather, showing the rain, where it is at.
 3   Q Do you know the name of that app?
 4           MR. RAYMOND MASSEY:  The Captain is
 5     pulling out his phone with an app on it, I
 6     guess.
 7       (Witness reviews cellular phone)
 8   A NOAA Weather Radar, N-O-A-A.
 9   Q How do you spell that?
10   A N-O-A-A Weather Radar.
11   Q So you didn't look at anything that would say --
12     well, so you don't consider thunderstorms to be
13     synonymous with lightening storms?
14   A They can be.  Yes, they can be.
15   Q But you didn't know one way or the other whether
16     this storm or this weather coming on was going to
17     be a lightening storm?
18   A No, sir.
19   Q Now, are there apps that tell you whether there is
20     going to be lightening coming?
21   A I'm sure there is apps out there that do that, but
22     I don't have it.
23   Q Okay.  Let's look at that injury/illness/incident
24     report.
```

Page 30

1    (Witness reviews document)
2  Q  You signed that, correct?
3  A  Yes, sir. That's my signature at the bottom.
4  Q  Okay.
5         MR. RAYMOND MASSEY: And just for
6      identification purposes, they are referring
7      to Bates stamp 06.
8  Q  And what writing is yours?
9  A  The writing at the bottom, my name, Captain. Then
10     right above it proper lifting, bend with knees.
11     Line 15 was Dane Haukedahl and Anthony Ginn.
12     And line 9, that's my writing.
13 Q  And it seems that Ryan Ruddell also signed that
14     document. Or I don't know if he signed it.
15     But it says "completed by" in number 17, correct?
16 A  Yes. That's his handwriting on 17.
17 Q  Were you there when he was filling it out?
18 A  Yes, sir.
19 Q  And were you discussing it with him at the time?
20 A  We were discussing his injury, yes, sir.
21 Q  Okay. So you have got the place the incident
22     occurred "first coupling at L&C fleet." How did
23     you come upon that information?
24 A  From what he had told me.

Page 31

1  Q  Okay. And number 11, where he filled that in,
2      "took wire off timber head (fleeting barges),"
3      did you discuss that with him?
4  A  He just told me that he took the wire off a timber
5      head.
6  Q  And number 12, it says, "took wire off timber head
7      and handed it to the mate." Did you discuss that
8      with him?
9  A  Yes. He discussed that with me, yes.
10 Q  Was there anything unusual about how he did that,
11     in your opinion?
12        MR. RAYMOND MASSEY: Object to the
13     form of the question. There was no
14     foundation laid that the Captain knows that.
15 A  I couldn't see that from my perspective. From my
16     -- from the wheelhouse, I could not see.
17 Q  So you don't have any opinion one way or the other
18     whether he did that correctly?
19 A  I have --
20        MR. RAYMOND MASSEY: Object to the
21     form of the question. He said he didn't see
22     anything. I don't know that you have asked a
23     foundation to ask for an opinion. Go ahead,
24     sir.

Page 32

1  A  I can't tell you if he took the wire off correctly
2      or not. Like I said, I could not see from my
3      vantage point.
4  Q  Well, you criticized his lifting in number 4,
5      isn't that correct, where you filled that in?
6  A  Yes, sir.
7  Q  But you didn't see him lifting; is that not
8      correct?
9  A  That day I did not see him, no.
10 Q  So upon what did you base this statement that
11     proper lifting would prevent a recurrence?
12 A  I based that on from what he told me and what the
13     first mate told me, that he was bent over with his
14     back. And it is policy that we do proper lifting
15     and bending by the knees.
16 Q  Okay. What did he tell you with regard to that?
17 A  Did who what tell me, Ryan or Dane?
18 Q  Ryan. Ryan. Or Ryan. Ryan.
19 A  Ryan just told me he hurt his back by bending
20     over.
21 Q  Did he tell you how he was bending over?
22 A  No, sir.
23 Q  Okay. What about number 13? What did he tell you
24     the types of hurt or soreness he had?

Page 33

1  A  He pretty much told me what he wrote there, about
2      his groin area hurting, I can't hardly read this,
3      shooting pain down the front of his leg. That's
4      what he told me.
5  Q  And prior to that time had you noticed any
6      abnormal behavior of Ryan with regard to his
7      ability to work and move and get around?
8  A  No, sir.
9  Q  Now, he -- let's look at 003.
10        (Witness reviews document)
11 Q  Now, that's the crew member's report of injury,
12     isn't that correct?
13 A  Yes, sir. That's Ryan's, yes.
14 Q  And so would you agree or disagree or not know
15     whether or not lightening was observable at
16     6:45 p.m.?
17 A  At 6:45 there was no lightening.
18 Q  What time did they come back up to the wheelhouse?
19 A  They came back to the boat, I don't know exact
20     time, maybe about 6:55, somewhere in that
21     ballpark.
22 Q  Oh. So you are saying that you saw lightening at
23     or about 6:55 but not at 6:45?
24        MR. RAYMOND MASSEY: Object to the

Page 34

1   form of the question. You've already asked
2   and answered that. You have already asked
3   the question and the Captain has already
4   answered that no lightening was observable
5   until they were in the boat.
6       MR. O'BRYAN: I'm just --
7   Q   You can answer.
8   A   The crew members were back on the boat during the
9   lightening, which, give or take, was around 6:55
10  or so.
11  Q   All right. And so on 003, which is Mr. Ruddell's
12  accident report, you would not dispute his -- what
13  he wrote in the weather conditions of heavy rain
14  and thunderstorms, correct?
15  A   In what -- what form are you looking at?
16  Q   003.
17  A   I see no weather. Oh. Heavy rain.
18  Q   It is about five lines down.
19  A   Yeah, "weather conditions." Now, what was your
20  question, again?
21  Q   You would not disagree with his description of
22  heavy rain and thunderstorms, isn't that correct?
23  A   No. I wouldn't disagree, no.
24  Q   So in terms of thunderstorms versus lightening

Page 35

1   storms, you don't -- am I correct that you don't
2   consider it to be a lightening situation -- or,
3   no, strike that.
4       Am I correct that you don't consider a
5   thunderstorm to be a lightening situation unless
6   you visibly observe the lightening?
7       MR. RAYMOND MASSEY: Object to the
8   form of the question. It is vague and
9   ambiguous. Go ahead, Captain.
10  A   In my experience on the river of 32 years,
11  thunderstorms can be nothing but rain, then it
12  could also have association with lightening.
13  Q   Well, is there anything different in your mind
14  between heavy rain and -- heavy rainstorm and
15  thunderstorm?
16  A   A thunderstorm can be heavy rain with a -- the
17  sound of thunder -- I mean, thunder to it and
18  still be no lightening.
19  Q   Now, where is this rule that you made reference to
20  earlier that you shouldn't be working in
21  lightening storms?
22  A   That's in our policies.
23  Q   And if I were to make a request for that, I mean,
24  what would I ask for? Your policy book or?

Page 36

1   A   You would have to request on our policies what our
2   policy is for working in adverse weather.
3   Q   And what does it say, if you recall?
4   A   I couldn't tell you exactly word for word what it
5   says without being able to look at it.
6   Q   What is your best recollection?
7   A   During lightening storms we don't work; there's
8   other things in there, icy conditions.
9       MR. O'BRYAN: Would you happen to
10  have -- okay. Off the record.
11      (Discussion held off the record)
12  BY MR. O'BRYAN:
13  Q   Irrespective, Captain, it is your recollection
14  that there is a written rule regarding working in
15  lightening conditions, correct?
16  A   It's been a standard rule since I've worked here
17  at Marathon. We do not work in the lightening.
18  Q   Okay. Now, let's get back for a moment to this
19  injury/illness/incident report. I think it was
20  00, I have, 729 but I forget what your number is.
21      MR. RAYMOND MASSEY: I think it is
22  06, I think is what you are mentioning.
23      MR. O'BRYAN: Okay.
24  BY MR. O'BRYAN:

Page 37

1   Q   Now, this proper lifting with the knees, so tell
2   us about that, that entry you put to prevent a
3   recurrence.
4       MR. RAYMOND MASSEY: What do you
5   mean by "tell us about that"? It is just
6   vague and ambiguous. Do you mean --
7   Q   What does that mean?
8       MR. RAYMOND MASSEY: -- have him
9   explain the rule or what?
10      MR. O'BRYAN: Yeah, that would be
11  good.
12      MR. RAYMOND MASSEY: All right.
13  A   There are training. He has to do training every
14  year. We all have to do training. And there's a
15  video that you watch that teaches you, tells you
16  how to properly lift, how to do it and not to do
17  it.
18  Q   What were the wind conditions at the time of this
19  incident?
20  A   Best to my recollection -- the best I can
21  remember, it was maybe like a five mile an hour
22  wind, according to my wind meter.
23  Q   How many miles?
24  A   Five.

Page 38

1   Q   Was it a situation where the rain was blowing
2       sideways?
3   A   No, sir.  It was coming straight down.
4   Q   So you're saying that the electrical storm aspect
5       of this period of time did not become apparent to
6       you until after Mr. Ruddell and the other crew
7       members were back in the wheelhouse?
8               MR. RAYMOND MASSEY:  Object to the
9           form of the question.  It is vague and
10          ambiguous as you've phrased it.  Go ahead,
11          Captain.
12  A   The crew members were back safely on board when
13      the lightening actually started getting closer to
14      the area.
15  Q   Now, when you got off watch on that day and you
16      went down to the galley, you smelled Bengay at
17      that time?
18  A   Yes, sir.
19  Q   And did you look into that at all --
20  A   No, sir.
21  Q   -- like who is wearing -- who is using Bengay or
22      anything like that?
23  A   No, sir.
24  Q   But that was kind of -- you noticed it --

Page 39

1   A   Yes.  I could smell it.
2   Q   -- correct?
3   A   Yes.  I could smell it.
4   Q   But you didn't ask around, all right.  And the
5       reason why you did not observe this incident is
6       because it was raining so hard at the time, isn't
7       that correct?
8   A   It was a combination of the rain and my vision due
9       to the barge.
10  Q   But in your witness statement reporting to your
11      company you just said you didn't see what was
12      going on because it was raining hard, isn't that
13      correct?
14          (Witness reviews document)
15              MR. RAYMOND MASSEY:  Do you want
16          him to look at something?
17              MR. O'BRYAN:  Yeah.  Look at number
18          11.
19              MR. RAYMOND MASSEY:  Number 11?
20              MR. O'BRYAN:  Yeah.
21  A   Yes, it was raining hard.  But also, like I said,
22      due to the configuration of the barge I could not
23      see the crew members.
24  Q   Okay.  Let's look at the log, number 643.

Page 40

1   A   (Witness so complies).
2   Q   So which entry would be closest in time to this
3       incident at 6:45?
4   A   The 16:40 traffic delay.
5   Q   Okay.  Where were you when you came on watch?
6   A   When I come --
7               MR. RAYMOND MASSEY:  Object to the
8           form of the question.  It has already been
9           asked and answered.  But go ahead, Captain.
10  A   I relieved the pilot, I believe it was, 11:05.  I
11      was below the Chain of Rocks Canal bridges.
12  Q   Were you tied off or?
13  A   No, sir.  I was proceeded northbound.
14  Q   And then you had to go through a lock?
15  A   No, sir.  I was above the lock.
16  Q   Did you note the lock delay?
17  A   The pilot incurred lock delay, yes.
18  Q   Okay.  And then you had to go through the lock at
19      15:30, isn't that correct?
20  A   The pilot locked at 15:30.
21  Q   Well, which entries -- what mile numbers on this
22      log sheet that you had the sticks?
23  A   I came on at 17:05.
24  Q   Oh, okay.

Page 41

1   A   Yeah.  I looked at the noon position instead of
2       the evening.
3   Q   Okay.  So what does that say for "description of
4       operation" at 17:05?
5   A   That's when I did watch change protocol with the
6       pilot and relieved him.
7   Q   And is that when you had the discussion with the
8       crew members about bad weather was coming,
9       et cetera?
10  A   That was at 17:30.
11  Q   Okay.  Was that noted anywhere on a document or it
12      is just your recollection?
13  A   We have a shift starter log that's noted on there
14      when the shift starter took place.
15  Q   Oh.  Well, what else is on -- that is a shift
16      starter log?
17              MR. RAYMOND MASSEY:  Which one is
18          that?
19  Q   Is that what it is called?
20  A   Yes.  It shows that we did -- they did a shift
21      starter before coming on watch.  We discussed what
22      was fixing to take place during that time.
23  Q   And what type of entries are put in that shift
24      starter log?

1   A    It would have my name on it, Dane's name on it,
2        and what shift starter was performed, which would
3        have been fleeting tow.
4   Q    So do you note like bad weather coming or anything
5        like that?
6   A    Weather was discussed, yes.
7   Q    Would it have been, you know, put down on the log?
8   A    No, sir.
9                MR. O'BRYAN:  Off the record.
10              (Discussion held off the record)
11  BY MR. O'BRYAN:
12  Q    Okay.  So between -- so you have got mile 190,
13       196 -- and 196 noted in your entries on that log
14       sheet, correct?
15  A    Yes, sir.
16  Q    Now, between what two points in time would the
17       report of the incident have occurred?
18  A    18:45 is when the -- he assumed that it happened.
19  Q    So you were at the fleet at that time?
20  A    Yes, sir.
21  Q    And when did you eventually load?
22              MR. RAYMOND MASSEY:  I think you
23          cut out.  What was that question?
24  A    You will have to repeat the question.  You are

1        kind of cutting in.
2   Q    Okay.  I'm sorry.  At 18:30 you put down "stand by
3        the load," isn't that correct?
4   A    Yes.
5   Q    When did you load?
6   A    Did we load, start loading?
7   Q    Yeah.
8   A    I do not have that information in front of me to
9        tell you exactly when we started.
10              MR. RAYMOND MASSEY:  Do you want to
11          look at another log?  Do you want him to look
12          at another log, Dennis?
13              MR. O'BRYAN:  Yeah.
14              MR. RAYMOND MASSEY:  I mean, they
15          didn't load for a day or two.  Do you want
16          him to see another log?
17              MR. O'BRYAN:  Yeah.
18              MR. RAYMOND MASSEY:  Okay.  I'm
19          showing the Captain what has been marked as
20          Bates stamp 642, which is a log for 8/28.
21          Do you want him to look at that?
22              MR. O'BRYAN:  Yeah.
23              MR. RAYMOND MASSEY:  That's the
24          next day.

1                (Witness reviews document)
2                MR. RAYMOND MASSEY:  And I'll show
3        him 8/29 as well, which is Document 641.
4                (Witness reviews document)
5                MR. RAYMOND MASSEY:  And I'll show
6        him 639, which is -- let's see.  Actually,
7        I'll show him 640, which is 8/30, that's
8        August 30th.  And then I'll show him 639,
9        which is August 31.
10               So in summary I'm showing the
11       Captain the log for 8/28, 8/29, 8/30, 8/31.
12       That's for the next four days, Dennis, all
13       right?  Is that what you want?
14               MR. O'BRYAN:  All right.  Yeah.
15               MR. RAYMOND MASSEY:  And your
16       question was, when did they begin to load,
17       right?
18               MR. O'BRYAN:  Right.
19               THE WITNESS:  That's not on any of
20       these dates.
21               MR. RAYMOND MASSEY:  Okay.  Did you
22       hear what he said?  He said it is not on any
23       of these dates.
24  BY MR. O'BRYAN:

1   Q    So you didn't load for a number of days after?
2   A    Yes, sir.  It was several days after.
3   Q    So did you just stay there at the fleet for a
4        number of days?
5   A    We would run up to Mike's every now and then, once
6        to, you know, get supplies and groceries and stuff
7        like that, I believe.  Or it looks like -- no.
8        We sit there, according to my logs here that I am
9        looking at, we sit there -- sit there in the fleet
10       for them days.
11               MR. RAYMOND MASSEY:  Actually, I'm
12       showing him the next -- if you want me to,
13       I'll show him the next couple of days.  Do
14       you want him to do that?  Dennis, do you want
15       him --
16               MR. O'BRYAN:  Yeah, that would be
17       all right.
18               MR. RAYMOND MASSEY:  Okay.  Well,
19       I'm just trying to move it along.
20               I'm showing him also logs for
21       September 1 and September 2, and that's
22       document Bates stamp 638 and 637.
23               And so in summary we've now got the
24       logs from 8/28, 8/29, 8/30, 8/31, 9/1, and

Page 46

1    9/2.
2  A  We're still just standing by waiting to load, even
3     to them dates.
4  Q  Okay. So, now, I know that at the bottom of that
5     log sheet, I'm looking at 643 for 8/27, it has an
6     entry for weather. But that apparently is just
7     for delays, is that correct?
8           (Witness reviews document)
9  A  Which log is that, again, sir?
10 Q  643.
11          MR. RAYMOND MASSEY: That's the
12         date of 8/27. What is your question?
13 A  There is no weather delay on there.
14 Q  Right. Is there anywhere where you record the
15    weather? Did you record electrical storms
16    anywhere?
17 A  No, sir.
18 Q  If you were to record such a thing, where, if
19    anywhere, would you have recorded it?
20          MR. RAYMOND MASSEY: Object to the
21         form of the question. I think he's answered
22         they don't record it, but. It has been asked
23         and answered. Go ahead, Captain.
24 A  We don't record the weather other than if we have

Page 47

1     to stop due to the weather.
2  Q  Yeah. Do you record things like that or not
3     really?
4  A  If it's a heavy rainstorm, we'll record it. We'll
5     have to stop due to visibility. We'll record that
6     or a heavy snowstorm.
7  Q  Okay. And at the time of this incident you had a
8     heavy rainstorm that affected your visibility,
9     isn't that correct, at 6:45?
10 A  Yes.
11          MR. O'BRYAN: All right. That's
12         all I have for you, Captain.
13          MR. RAYMOND MASSEY: Captain, I
14         have some questions. I'll be brief.
15          EXAMINATION
16 BY MR. RAYMOND MASSEY:
17 Q  So that there is no confusion, Captain, because it
18    was asked a number of different times, while the
19    crew members were out tying off the barges at the
20    fleet, was there any lightening at that time, sir?
21 A  No, sir.
22 Q  Lightening was observed later in the day after the
23    crew members came back to the boat, is that true,
24    sir?

Page 48

1  A  Yes, sir.
2  Q  By that time had the barges already been tied off
3     in the fleet there at Lewis and Clark?
4  A  Yes. They had already been secured.
5  Q  Looking at the logs that you have looked at, over
6     the next several days did the motor vessel
7     Nashville and the barges stay generally at that
8     facility while they were waiting to be loaded?
9  A  Yes, sir.
10 Q  At any time during the operation, where the crew
11    members were out on the tow, did you or anyone
12    tell any of the crew to hurry?
13 A  No, sir.
14 Q  Do you and the company have a policy against
15    hurrying out on the deck?
16 A  Our policy is safety first. We do not make
17    anybody rush because we want to make sure
18    everybody stays safe.
19 Q  In the rain, if it's raining, is there a custom
20    and practice as far as whether or not you hurry or
21    not or even slow down under those circumstances?
22 A  Everybody has the right to say "stop" if they feel
23    that things are unsafe, including me and, plus, my
24    crew.

Page 49

1  Q  All right. If, for example, any crew member saw
2     lightening or were nervous about any lightening
3     conditions in the area, can any of the crew
4     members stop operations immediately?
5  A  Yes, sir.
6  Q  Did anything like that occur during the time any
7     of the crew members were out on the vessels at the
8     time of this incident?
9  A  No, sir.
10 Q  At the time of this incident -- strike that.
11         How long did this entire operation take from
12    the time your vessel and its tow arrived at Lewis
13    and Clark until the crew members were back inside
14    the boat?
15 A  Roughly about 25 to 30 minutes.
16 Q  And when they -- when the crew members first went
17    out on deck, was there any rain at that time?
18 A  No, sir, there was none.
19 Q  But during the process of tying off the barges to
20    the fleet it began to rain?
21 A  Yes, sir. When we first started catching the
22    first head wire, it started to rain.
23 Q  All right. There was some questions about the
24    vessel video and the fact that you have some video

1  cameras on the boat itself. And you talked about
2  not being able to see the crew members.
3      If you look from the head of the tow back to
4  the next coupling, is that where they were doing
5  the work at the time -- at the last coupling or
6  not? That was a bad question. Let me rephrase
7  the question.
8      How many couplings would you say that you had
9  in this tow of six barges?
10 A  Two.
11 Q  And if you go from the front or the bow of the tow
12 backwards, the first coupling would be between the
13 first barge and the second barge, is that true?
14 A  Yes.
15 Q  And the second coupling would be between the
16 second barge and the third barge --
17 A  Yes, sir.
18 Q  -- back towards the boat?
19 A  Yes, sir.
20 Q  The last coupling that the crew was involved in
21 would have been coupling number two?
22 A  Yes.
23 Q  Now, at the time the Nashville crew was working
24 out on the barges there was another crew working

1  out there with them, is that true?
2  A  Yes, sir. The tug service there, their guys were
3  out there.
4          MR. O'BRYAN: Ray?
5          MR. RAYMOND MASSEY: I'm sorry?
6          MR. O'BRYAN: Ray, can we just take
7  a short break? I have to go use the
8  restroom.
9          MR. RAYMOND MASSEY: Okay. That's
10 fine. Taking a break.
11         (11:02 a.m. BREAK 11:09 a.m.)
12 BY MR. RAYMOND MASSEY:
13 Q  Captain, when the, I'll use the phrase, tying off
14 procedure was being done at Lewis and Clark and
15 the Lewis and Clark people were there and our deck
16 crew were there, did all of the people have
17 communication devices of one sort or another?
18 A  Yes. They all had walkie-talkies, VHS.
19 Q  So that they could communicate with you, that is
20 your crew members, and so that the Lewis and Clark
21 people could communicate with their wheelhouse?
22 A  Yes, sir.
23 Q  At any time did any of our crew members or any
24 crew members, to your knowledge, say anything to

1  you or mention that the conditions were such that
2  they wanted to quit or they were coming in or
3  anything like that?
4  A  No, sir.
5  Q  And had they wanted to do that could all of them
6  freely communicate to you and then come in?
7  A  Yes, sir.
8  Q  After the rain started and even up to the time
9  when it was raining the hardest, I think you
10 indicated the rain was coming down and was not
11 blowing sideways?
12 A  No. It was coming straight down.
13 Q  And how would you judge the amount of rain? If
14 you use like an inch an hour, a half inch an hour,
15 or whatever, would you be able to give us an
16 estimate of your thoughts?
17 A  At the heaviest -- at the heaviest point?
18 Q  Yes, sir, at the heaviest points.
19 A  I would say probably about an inch an hour.
20 Q  And were any of the crew members out there, our
21 crew members or the Lewis and Clark crew members,
22 were any of them wearing any kind of rain gear?
23 A  Not that I can remember, no.
24 Q  Is that customary, not to wear rain gear in the

1  summer in the Saint Louis area if it is raining
2  like that?
3  A  That's -- that's their discretion if they want to
4  wear it. I mean...
5  Q  All right. We had rain gear available if anybody
6  wanted to use it?
7  A  Yes, sir.
8  Q  Now, looking at the logs that you have, it appears
9  that after the barges were tied off that you all
10 generally remained in that same location at
11 Lewis and Clark for at least four or five or
12 six days after you all landed, is that true?
13 A  Yes, sir.
14 Q  And during that time the barges, when they were
15 ready to be loaded, would be taken out two at a
16 time and taken to the facility to be loaded?
17 A  Yes, sir.
18 Q  But it was almost a week before you all left that
19 area after being loaded at least?
20 A  Yes, sir.
21 Q  So there was no hurrying or particular reason to
22 be in a hurry to do anything, was there?
23 A  No, sir.
24 Q  Now, after this incident on the 27th, the next day

Page 54

1  on the 28th the incident was reported to you as
2  the Captain?
3  A  Yes.
4  Q  At any time when you talked to Mr. Ruddell, or
5     Mr. Ruddell (pronouncing), did he indicate to you
6     that he had any difficulties with wires of any
7     sort?
8  A  No, sir.
9  Q  Did he indicate that weather played any part in
10    causing or contributing to cause his injury in any
11    kind of way?
12 A  No, sir.
13 Q  Did he ever indicate that he tripped or slipped or
14    fell in any kind of way?
15 A  No, sir.
16 Q  Did he ever indicate to you that he complained of
17    hurrying or the circumstances under which they
18    were doing their work at all?
19 A  No, sir.
20 Q  Now, you indicated that you wrote down something
21    about not bending his knees.
22       Did Dane, the mate, indicate that he had seen
23    Mr. Ruddell hand him the wire?
24 A  Yes.  He had seen him bend over at the waist.

Page 55

1  Q  And bending over at the waist, is that a violation
2     of a safety rule at Marathon?
3  A  Yes, sir.
4  Q  And why is that, sir?
5  A  Because you can hurt your back that way.
6  Q  What are you supposed to do?
7  A  Bend with your knees.
8  Q  And what does that mean, "bend with your knees"?
9  A  Just like squatting with your knees and keeping
10    your back straight.
11 Q  Does it mean you are supposed to spread your legs,
12    bend your knees so that when you lift anything you
13    are lifting with your knees rather than your back?
14 A  Yes, sir.
15 Q  Is that to prevent back strains?
16 A  Yes, sir.
17 Q  And sprains?
18 A  Yes, sir.
19 Q  Given the information that you got from
20    Mr. Dane -- from Dane, the mate, is it your view
21    that Mr. Ruddell violated a safety rule at
22    Marathon?
23 A  Yes, sir.
24 Q  Did Mr. Ruddell admit that he bent from his waist?

Page 56

1  A  I do not recall him saying that he bent by his
2     waist.
3  Q  Okay.  You indicated, I think, that it has been
4     your policy and Marathon's policy never to work in
5     lightening for as long as you have been with the
6     company?
7  A  Yes, sir.  And that's just common, what they call,
8     good seamanship practice.
9  Q  All right.  You are not saying that that is
10    written down in writing someplace in a manual or
11    something; you are not saying that?
12 A  No, sir.
13 Q  But there are some references in some policy
14    manuals dealing with discretion to use additional
15    people, et cetera, under certain weather
16    conditions, is that right?
17 A  Yes, sir.
18       MR. O'BRYAN:  I'm going to object
19       under Rule 1001, the best evidence rule,
20       because I have not seen this thing that you
21       are talking about.
22       MR. RAYMOND MASSEY:  Okay.  I'll
23       rephrase the question.
24 Q  Assuming, Captain, that there is an area in the

Page 57

1  policies that say something to the effect --
2       MR. O'BRYAN:  Why don't you give it
3       to him and so I can look at it, too.
4       MR. RAYMOND MASSEY:  Hold the
5       thought.
6  Q  -- "Exception:  In certain circumstances (for
7     example inclement weather) the boat captain and/or
8     pilot may use their discretion and increase the
9     number of required personnel to perform the tasks
10    outlined in this document."
11       Have you heard that language before, Captain?
12 A  Yes, sir.
13 Q  Is that what you meant by policies about
14    discretion in inclement weather, for example?
15    Is that what you meant by that?
16 A  Yes, sir.
17       MR. O'BRYAN:  What number are we
18       looking at?
19       MR. RAYMOND MASSEY:  Just for the
20       record, that language is contained in Bates
21       stamped Document 1795, among other places.
22       But the other places I think the wording is
23       very much the same if not the same.
24 BY MR. RAYMOND MASSEY:

Page 58

1  Q  So, Captain, the boat captain and/or the crew, for
2     example, if there is inclement weather they have
3     discretion in whether or not to work in it or not?
4  A  Yes, sir.
5  Q  And what would be the determinant factors? Would
6     safety be the determinant factor?
7  A  Yes, safety would be.
8  Q  And is that one of the reasons that you, yourself,
9     and Marathon has the policy that you do not work
10    out on steel decks if it is lightening?
11 A  Yes.
12 Q  And on this day any lightening that was in the
13    area occurred after the crew had already finished
14    their job and were back inside the boat?
15 A  Yes, sir.
16 Q  Do you have a visualized picture of this tow in
17    front of the vessel in your mind, Captain?
18 A  Yes, sir.
19 Q  If the last tie-off was done at the second
20    coupling from the head, which would be the first
21    coupling from the boat --
22 A  Yeah.
23 Q  -- would the cameras that are centered on the boat
24    or alongside the boat even have been able to see

Page 59

1     any action of the crew at that coupling?
2  A  No, sir. Due to the configuration of the barge,
3     it be wouldn't have picked it up.
4  Q  All right. And what that means is, because of the
5     way the barges are structured in connection with
6     the gunnel, or the walkway, where the crew were in
7     an area where the cameras would not be able to
8     observe their actions; is that what you mean by
9     that?
10 A  Yes.
11 Q  And is that the reason you were not able to
12    visualize the crew as they were doing the work in
13    that location?
14 A  Yes, sir.
15 Q  Now, in fairness, at certain times it was raining
16    hard enough so your visibility was limited
17    somewhat?
18 A  Yes, sir.
19 Q  And what is your estimate of how far you could see
20    out from the wheelhouse at the most significant
21    rainfall?
22 A  About a hundred -- 300 feet.
23 Q  About one barge length?
24 A  Yes, sir.

Page 60

1  Q  So you could see about one barge length. But then
2     because of the rainfall, if it was an inch an
3     hour, it was raining hard enough so you couldn't
4     see beyond that, it was obscured somewhat?
5  A  Yes, sir.
6  Q  Is that what you meant by that?
7  A  Yes, sir.
8  Q  There was also some mention about videos and
9     taking videos off the vessel. Do you remember
10    that testimony, sir?
11 A  Yes, sir.
12 Q  In the notes that were from Mr. Perkins' notes he
13    indicated something about pulling Mike's videos or
14    something. What was meant by that, in your
15    judgment?
16 A  Pulling Mike's videos would have showed
17    Ryan Ruddell getting off the boat and if he had
18    been -- it could have showed if he was walking
19    differently or whatever, if he was in pain.
20 Q  Is that because at Mike's facility, which is a
21    marine facility there in the area, that they have
22    -- they have cameras at their facility that would
23    show their walkways?
24 A  Yes, sir. They have surveillance cameras.

Page 61

1  Q  You don't have any knowledge one way or another if
2     anybody ever actually pulled them off or looked at
3     them or anything like that?
4  A  No, sir.
5  Q  And the knowledge you would have about the
6     wheelhouse videos, those are not CDs like
7     Mr. O'Bryan was referencing to take in and out,
8     those were videos that were broadcast back at the
9     office for the port captains to take a look at
10    live, or do you even know?
11 A  It's about box that we can't get into which
12    records the videos. I do not have access into
13    getting it in there to pull up videos, but the
14    port captains do. They can pull it up remotely
15    from the office.
16 Q  Okay. But even if you had a video on this
17    particular day at this particular time, the videos
18    wouldn't have shown the operation where they were
19    doing it the last place they were doing it before
20    they got off the tow anyway?
21 A  No, sir. You wouldn't have been able to make it
22    out or see it.
23 Q  All right. Let's talk about the next morning
24    after this incident on the 27th. You observe

Page 62

1      Mr. Ruddell that next morning; is that true, sir?
2    A  Yes, sir.
3    Q  He came up to do the stretching exercises that you
4      all do before you go out on watch?
5    A  Yes, sir, stretching and shift starter.
6    Q  Okay.  At that time or in close proximity after
7      that it got reported to you that there was some
8      kind of an incident?
9    A  Yes, sir.
10   Q  And that's when you began to fill out the report,
11     some of which he have talked about here today?
12   A  Yes, sir.
13   Q  And some of which were marked as exhibits here
14     today?
15   A  Yes, sir.
16   Q  At any time in any of that discussion did
17     Mr. Ruddell mention anything about any wires being
18     bad?
19   A  No, sir.
20   Q  Or any problems with any wires?
21   A  No, sir.
22   Q  Or any weather having anything to do whatsoever
23     with any incident that occurred to him?
24   A  No, sir.

Page 63

1    Q  Or that he was feeling hurried or that anyone had
2      told him to hurry?
3    A  No, sir.
4    Q  Captain, you have been at Marathon for about eight
5      years.  But before that you worked on the river?
6    A  Yes, sir.
7    Q  Who did you work with, sir?
8    A  I worked for Mid-South Towing.
9    Q  And Mid-South Towing is a towing company out of
10     Tampa, Florida; is that where they are
11     headquartered or do you know?
12   A  Yeah.  That's TECO.
13   Q  Okay.
14   A  Tampa Electric owned -- owned Mid-South Towing.
15   Q  I got you.  So you worked on big line boats for
16     Mid-South?
17   A  Yeah, for 22 years.
18   Q  So altogether, then, that is 30 years worth of
19     wheelhouse experience?
20   A  A bit part, about half of it.
21   Q  Okay.  So before Mid-South, who did you work for?
22   A  I worked for ago Eggert and Walker Towing.
23   Q  Okay.  Out of Paducah, Kentucky?
24   A  Yes, sir.

Page 64

1    Q  And those were working on big line boats as well?
2    A  Medium size.
3    Q  All right.  How big is the Nashville?  What kind
4      of horsepower?
5    A  It is a 150 foot long, 45 foot wide, and it is now
6      5,000 horsepower.
7    Q  And all of the boats at Mid-South, were they
8      5,000's or 5,600's or what were they?
9    A  No, sir.  We had anywhere from 1,000 horsepower to
10     9,000.
11   Q  And you worked on all of them?
12   A  Yes, sir.
13   Q  What licenses do you have that are issued by the
14     United States Coast Guard?
15   A  I have western rivers master's and I have inland.
16   Q  You have inland operators and you have master's
17     license?
18   A  I have western river master; I have inland mate
19     pilot license.
20   Q  Okay.  And you are considered to be a master
21     pilot?
22   A  On the western rivers.
23   Q  Yes.  That is the highest license you can have on
24     the western rivers?

Page 65

1    A  Mine is only 500 gross ton.  You can get up to
2      unlimited.
3    Q  Okay.  If you are navigating on the Great Lakes,
4      et cetera?
5    A  Well, the unlimited would be where you could
6      operate like the Delta Queen or...
7    Q  I got you.  Pleasure crafts, that sort of thing?
8    A  Gambling boats that used to run.
9    Q  Yeah.  Is the practice that you and Marathon have
10     concerning working under the weather conditions
11     that you have described, are they in accordance
12     with the custom and practice generally in the
13     marine business?
14   A  Yes, sir.
15              MR. RAYMOND MASSEY:  Thank you,
16         Captain.  That's all I have.
17              THE WITNESS:  All right.  Thank
18         you.
19              MR. RAYMOND MASSEY:  Do you want to
20         mark these as exhibits, Dennis?
21              MR. O'BRYAN:  Yeah.  I've got a
22         couple more questions based on your cross.
23              MR. RAYMOND MASSEY:  Okay.
24                   ======

1       RE-EXAMINATION
2   BY MR. O'BRYAN:
3   Q   Now, Captain, defense counsel's asked you in a few
4       different ways whether the crew members had to
5       hurry.  Do you recall those questions?
6   A   Yes, sir.
7   Q   Let's just call that the "hurry up factor," okay?
8   A   Okay.
9   Q   And the hurry up factor was one of the things that
10      you discussed with defense counsel in this hour
11      and a half meeting that you had with them
12      yesterday?
13  A   Yes, sir.
14  Q   And you recognize that if a crew is being hurried
15      that that can increase the chances of injury,
16      isn't that correct?
17  A   Yes, sir.
18  Q   And that can increase the chances of the crew
19      taking shortcuts to get their work done if they
20      are being unnecessarily hurried, isn't that
21      correct?
22  A   That would be up to them, if they take shortcuts.
23  Q   I know.  But if they are being hurried up, I mean,
24      that could increase the likelihood of that?

1               MR. RAYMOND MASSEY:  Let me object
2           to the form of the question.
3   Q   Do you agree with that?
4               MR. RAYMOND MASSEY:  That's calling
5           for a hypothetical, I think.
6   Q   Can you answer it?
7   A   I don't agree with that.  I mean, there's a
8       difference between just being totally rushed or
9       picking up the pace just a little bit.
10  Q   Okay.  Let's say being rushed.  How can that
11      increase the chances of injury?
12  A   That could increase it some, yes.
13  Q   In what way?
14  A   If they get in too big of a hurry they could, you
15      know, slip, trip over something or get in too big
16      of a rush they could get hurts.
17  Q   Or just do things they shouldn't know how to do?
18  A   Once again, I cannot control what the other person
19      does.
20  Q   Okay.  Now, have you observed -- okay.  So you
21      indicated earlier when I was asking you some
22      questions with lightening or real bad rain, that
23      you would suspend operations, right?
24  A   Yes, sir.

1   Q   Now, had you observed lightening prior to this
2       6:45 time where the injury is said to have
3       occurred, what would you have done?
4   A   If I would have observed lightening at that point
5       in time, I would have stopped everything and
6       pulled my crew off the tow.
7   Q   And the same with the bad rain, correct?
8               MR. RAYMOND MASSEY:  Object to the
9           form of the question.  It is vague and
10          ambiguous.  Go ahead, sir.
11  A   I've worked in heavy rain; they've worked in heavy
12      rain.  That's just part of the job.
13  Q   I'm just talking about, though, you indicated
14      earlier that lightening and, you know, really bad
15      rain could cause you to suspend operation.  Do you
16      recall that?  Or you can clarify it if you want.
17  A   Okay.  When you are talking about real bad rain
18      for me to stop, that means I cannot use my radars,
19      they're blacked out and stuff, so I have to stop
20      because I cannot navigate.
21  Q   What about rain and wind so bad that it is blowing
22      crews across the barge; would that qualify?
23  A   Yes, sir.
24  Q   All right.  Now, Mr. Ruddell said that there was

1       no rain gear that would fit him on the boat; would
2       you agree, disagree, or do not know?
3   A   That, I would not know.  That's up to the mate to
4       make sure the proper rain gear is on the boat for
5       crew.
6   Q   Did Mr. Ruddell tell you that his injury occurred
7       while he was lifting a wire -- lifting a wire?
8   A   Yes.  That's what he told me.
9   Q   I don't know if you can hear me, but I'm going to
10      call on the phone.  All right.  I got you now.
11      Okay.  Now, can you stand up and show me the
12      proper way that you're supposed to do lifting with
13      your legs that you are talking about?
14  A   (Witness so complies).
15              MR. RAYMOND MASSEY:  Let the record
16          reflect that the Captain bent his knees, kept
17          his back straight, and raised straight up.
18              MR. O'BRYAN:  The picture shows
19          what it shows.
20              MR. RAYMOND MASSEY:  Yeah, but it
21          is not a video deposition.  So you didn't
22          arrange for a video deposition, so you won't
23          be able to see it, so somebody needs to
24          describe it.  So I have just described it.

Page 70

1     Let the record show the Captain
2         bent his knees, kept his back straight, went
3         straight down and with his arms lifted.
4     BY MR. O'BRYAN:
5     Q  And your legs are pretty much together as much as
6         you can, right?
7             MR. RAYMOND MASSEY:  No.  In fact,
8         they weren't together.
9     A  Actually, they are separate just a little bit.
10    Q  Just a little bit?
11            MR. RAYMOND MASSEY:  Shoulder
12        width.  If it had been on video, it would
13        show it is at least at shoulder width.
14            MR. O'BRYAN:  Right.
15            MR. RAYMOND MASSEY:  Which is the
16        proper way.
17    BY MR. O'BRYAN:
18    Q  Now, in order to squat like that you can't have
19        your feet too far apart, isn't that correct?
20    A  Yeah.  If you put them way, way far apart, you
21        don't want to lift like that.
22    Q  Now, I was looking at this thing in seventeen --
23        number 1795, this policy statement or whatever you
24        want to call it.

Page 71

1             And that doesn't have anything to do with you
2         suspending operations under lightening or those
3         type of conditions; that has to do with assigning
4         personnel to perform a task, isn't that correct?
5     A  Assigning more people, yes.
6     Q  You're cutting out.  But that doesn't have
7         anything to do with you suspending operations
8         under lightening conditions, is that correct?
9             MR. RAYMOND MASSEY:  I think his
10        answer was "assigning" -- the court reporter
11        will read it back.
12            THE REPORTER:  The answer was:
13        "Assigning more people, yes."
14            MR. RAYMOND MASSEY:  Did you hear
15        that, Dennis?
16            MR. O'BRYAN:  Right.  Yeah, yeah.
17        The problem I'm having is it is breaking up a
18        little bit.
19    BY MR. O'BRYAN:
20    Q  Okay.  And as the Captain you are the person in
21        command of your vessel, correct?  You are the top
22        of the food chain?
23    A  Yes, sir.
24    Q  And the safety of the crew is your responsibility?

Page 72

1     A  Yes, sir.
2     Q  And as a deckhand, Mr. Ruddell is pretty much at
3         the bottom of the food chain in terms of taking --
4         or giving orders, is that correct?
5             MR. RAYMOND MASSEY:  We couldn't
6         hear.  You have to re-ask that.
7     Q  Well, what is the hier -- just tell me the
8         hierarchy with regard to Mr. Ruddell.
9     A  I'm the captain, I'm the leader of the vessel, and
10        Ryan is the deckhand, which is the lowest part of
11        the chain of command.
12    Q  All right.  Now, the cameras and videos that we're
13        talking about here, they would have possibly
14        recorded when lightening was visible by the pilot
15        house, correct?
16    A  Yes, sir.
17    Q  Now, how many barge lengths in front of you was
18        Mr. Ruddell when this was occurring?
19    A  What was occurring, sir?
20    Q  When he was lifting the wire.
21    A  That was one barge length out, 300 feet.
22    Q  Now, you have just told defense counsel that you
23        could see one barge length out, correct?
24    A  The barge, yes.

Page 73

1     Q  But in the document you filled out that we've
2         already talked about a little bit you said that
3         your visibility -- you couldn't see them in part
4         because of the severity of the rain that was
5         coming down, isn't that correct?
6     A  Due to the rain was part of it, yes.
7     Q  So which way is it, you could see out to where he
8         was or that length or you could not?
9     A  I could see out 300 foot to the edge of the
10        coupling.  But where Mr. Ruddell was at I could
11        not see him because he was in behind the trunk of
12        the barge and the header pipes.
13    Q  But that's not what you put in your witness
14        statement, is it?
15            MR. RAYMOND MASSEY:  Which one do
16        you want him to look at?
17            MR. O'BRYAN:  Number 11.
18            MR. RAYMOND MASSEY:  Bates stamped
19        11, you mean?
20            MR. O'BRYAN:  Yeah.  Sorry.
21            MR. RAYMOND MASSEY:  That's all
22        right.
23            (Witness reviews document)
24    BY MR. O'BRYAN:

Page 74

1  Q  In your witness statement you said, "Wheelhouse
2     couldn't see what was going on. Was raining
3     hard." Is that correct?
4  A  Yes, sir.
5  Q  All right. And you indicated that Mr. Ruddell
6     didn't say anything about the weather playing a
7     role in his injury, correct?
8  A  Correct.
9  Q  But in his report of injury, 003, he did say that
10    there was heavy rain and thunderstorms, isn't that
11    correct?
12                 MR. RAYMOND MASSEY: Let me just
13        object to the form. It speaks for itself.
14        But go ahead, Captain. I'll show him 003.
15                 MR. O'BRYAN: All right.
16 A  Yes, the form says "heavy rain and thunderstorms."
17                 MR. O'BRYAN: All right. I have
18        nothing further.
19                 MR. RAYMOND MASSEY: I don't have
20        anything further, either, Dennis.
21                 MR. O'BRYAN: All right.
22                 MR. RAYMOND MASSEY: Do you want to
23        just not mark these exhibits and go with the
24        Bates stamp numbers?

Page 75

1                 MR. O'BRYAN: It would be nice if
2  we could mark them, I guess, and make it a
3  little easier.
4  (Discussion held off the record)
5                 (Exhibit 1 marked)

Page 76

1                 REPORTER'S CERTIFICATE
2  STATE OF KENTUCKY      )
3  COUNTY OF FAYETTE      )
4
5       I, LISA M. SCHWARZE (LARSON), FCRR, RPR, and
   Notary Public in and for the Commonwealth of Kentucky
   at Large, do hereby certify that the facts as stated
6  by me in the caption hereto are true; that the
   foregoing answers in response to the questions as
7  indicated were made before me by the witness
   hereinbefore named, after said witness had first been
8  duly placed under oath, and were thereafter reduced
   to computer-aided transcription by me and under my
9  supervision; and that the same is a true and accurate
   transcript of the proceedings to the best of my
10 ability.
11
        I further certify that I am not employed by,
12 related to, nor of counsel for any of the parties
   herein, nor otherwise interested in the outcome of
13 this action.
14
        IN WITNESS WHEREOF, I have affixed my
15 signature and seal this 18th day of July, 2016.
16
17
18
19
20        LISA M. SCHWARZE, FCRR, RPR
          Notary Public, State-at-Large
21        Notary ID 489705
22
23
24 My Commission Expires:  June 13, 2017

Page 77

1                 ERRATA SHEET
2       I, CAPTAIN MICHAEL WAYNE SCOTT, hereby certify
   that I have read the foregoing transcript, and
3  that the same is a true and accurate transcription
   of my testimony, except as noted below:
4
   PAGE   LINE NO.        CHANGE      REASON FOR CHANGE
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17
18        _____
          CAPTAIN MICHAEL WAYNE SCOTT
19
   STATE OF _____ )
20 COUNTY OF _____ )
21
        Subscribed and sworn to me on this ____ day of
22 _____, 2016.
23
          _____
                         Notary Public
24 My Commission Expires:

**Exhibits**

**EX 0001 M.
Scott 071316**
4:12 75:5

**0**

**00** 36:20
**003** 8:7 33:9 34:11,
16 74:9,14
**006** 8:7
**06** 27:9 30:7 36:22
**0643** 8:7
**0711** 8:8

**1**

**1** 45:21 75:5
**1,000** 64:9
**1001** 56:19
**11** 31:1 39:18,19
73:17,19
**11:02 a.m**
51:11
**11:05** 40:10
**11:09 a.m**
51:11
**12** 31:6
**13** 32:23
**14th** 25:6
**15** 30:11
**150** 64:5
**15:30** 40:19,20
**16:40** 40:4
**17** 30:15,16
**1795** 57:21 70:23
**17:05** 40:23 41:4

**17:30** 41:10
**18:30** 18:3 43:2
**18:45** 16:4 42:18
**190** 42:12
**196** 42:13

**2**

**2** 45:21
**2014** 5:15 6:2
15:21 25:7 26:8
**22** 63:17
**25** 49:15
**27th** 5:15 6:2
15:21 25:6 26:8
53:24 61:24
**28th** 54:1

**3**

**30** 49:15 63:18
**300** 59:22 72:21
73:9
**30th** 44:8
**31** 44:9
**32** 35:10
**339** 8:9 10:9
**340** 8:9
**3:40** 21:3

**4**

**4** 32:4
**45** 64:5

**5**

**5** 20:6
**5,000** 64:6

**5,000's** 64:8
**5,600's** 64:8
**500** 65:1
**5:30** 10:24 12:9,15
13:6,9,10,13

**6**

**637** 45:22
**638** 45:22
**639** 44:6,8
**640** 44:7
**641** 44:3
**642** 43:20
**643** 39:24 46:5,10
**6:25** 25:6
**6:45** 16:5,6 18:2,
18 19:5 20:12,14
26:8 33:16,17,23
40:3 47:9 68:2
**6:55** 33:20,23 34:9

**7**

**719** 8:9
**722** 8:9
**729** 26:20,22 36:20

**8**

**8/27** 46:5,12
**8/28** 43:20 44:11
45:24
**8/29** 44:3,11 45:24
**8/30** 44:7,11 45:24
**8/31** 44:11 45:24

**9**

**9** 30:12

**9,000** 64:10
**9/1** 45:24
**9/2** 46:1

**A**

**ability** 33:7
**abnormal** 33:6
**access** 21:2
22:19 25:11,19
27:24 61:12
**accident** 22:5,12
26:24 34:12
**accidents/
incidences** 22:1
**accordance**
65:11
**action** 59:1
**actions** 59:8
**additional** 56:14
**adjust** 27:22
**admit** 55:24
**adverse** 36:2
**affected** 47:8
**afternoon** 11:1,
20,24 12:15 13:6
**agree** 13:7 18:18
19:5 33:14 67:3,7
69:2
**ahead** 10:15
11:16 12:5 19:2,8
24:15 31:23 35:9
38:10 40:9 46:23
68:10 74:14
**airplane** 25:23
**alongside** 58:24
**altogether** 63:18
**ambiguous**
15:13 18:23,24 35:9
37:6 38:10 68:10
**amount** 52:13

**and/or** 57:7 58:1
**Anthony** 30:11
**app** 28:11,16,19,
21,24 29:3,5
**apparent** 38:5
**apparently** 46:6
**appearance**
19:19
**appears** 53:8
**apps** 6:21 27:23
28:6 29:19,21
**area** 15:8 16:11
33:2 38:14 49:3
53:1,19 56:24 58:13
59:7 60:21
**argumentative**
11:16
**arms** 70:3
**arrange** 69:22
**arrived** 49:12
**aspect** 38:4
**assigning** 71:3,
5,10,13
**association**
35:12
**assumed** 42:18
**Assuming** 56:24
**attention** 22:10
**August** 5:15 6:2
15:21 25:6 26:8
44:8,9

**B**

**back** 15:22 16:23
18:9 32:14,19
33:18,19 34:8 36:18
38:7,12 47:23 49:13
50:3,18 55:5,10,13,
15 58:14 61:8 69:17
70:2 71:11
**backing** 21:18